## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA

UH CAROLINA REALTY HOLDINGS LLC )
c/o The Corporation Trust Center )
1209 Orange St. )
Wilmington, DE 19801, )

    and )

UH CAROLINA SNF OPERATIONS )
HOLDINGS LLC )
c/o The Corporation Trust Center )
1209 Orange St. )
Wilmington, DE 19801 )

    and )

UH CAROLINA VACANT LAND )
HOLDINGS LLC )
c/o The Corporation Trust Center )
1209 Orange St. )
Wilmington, DE 19801, )

      Plaintiffs, )

      v. )

APPALACHIAN/ BRIAN ESTATES, INC. )
163 Shadowline Drive )
Boone, NC 28607, )

    and )

UNIVERSAL PROPERTIES/ )
GREENSBORO, LLC )
3724 Wireless Drive )
Greensboro, NC 28455, )

    and )

UNIVERSAL PROPERTIES/ )
BRUNSWICK, LLC )
1070 Old Ocean Highway )
Bolivia, NC 28422, )

    and )
)

Case No. _____

**COMPLAINT FOR SPECIFIC
PERFORMANCE OR, IN THE
ALTERNATIVE, FOR DAMAGES,
AND NOTICE OF LIS PENDENS**

UNIVERSAL PROPERTIES/CONOVER, LLC )
4174 Shook Road )
Claremont, NC 28610, )
)
    and )
)
UNIVERSAL PROPERTIES/CONCORD, LLC )
430 Brookwood Avenue NE )
Concord, NC 28025, )
)
    and )
)
UNIVERSAL PROPERTIES/ )
HENDERSONVILLE, LLC )
86 Old Airport Road )
Fletcher, NC 28732, )
)
    and )
)
UNIVERSAL PROPERTIES/WAKE, LLC )
410 Judd Parkway SE )
Fuquay-Varina, NC 27526, )
)
    and )
)
UNIVERSAL PROPERTIES / GREENVILLE, )
LLC )
2578 West Fifth Street )
Greenville, NC 27834, )
)
    and )
)
UNIVERSAL PROPERTIES/KING, LLC )
115 White Road )
King, NC 27021, )
)
    and )
)
UNIVERSAL PROPERTIES/LENOIR, LLC )
322 Nuway Circle )
Lenoir, NC 28645, )
)
    and )
)
)
)
)
)

2

UNIVERSAL PROPERTIES/LILLINGTON, LLC )
1995 E. Cornelius Harnett Blvd. )
Lillington, NC 27546, )
)
    and )
)
UNIVERSAL PROPERTIES/RALEIGH, LLC )
8200 Litchford Road )
Raleigh, NC 27615, )
)
    and )
)
UNIVERSAL PROPERTIES/NORTH )
RALEIGH, LLC )
5201 Clarks Ford Drive NW )
Raleigh, NC 27616, )
)
    and )
)
UNIVERSAL PROPERTIES/OXFORD, LLC )
500 Prospect Avenue )
Oxford, NC 27565, )
)
    and )
)
UNIVERSAL PROPERTIES/RAMSEUR, LLC )
7166 Jordon Road )
Ramseur, NC 27316, )
)
    and )
)
UNIVERSAL PROPERTIES/CHARLOTTE, LLC )
1930 West Sugar Creek Road )
Charlotte, NC 27316, )
)
    and )
)
UNIVERSAL PROPERTIES/COLUMBIA, LLC )
3514 Sidney Road )
Columbia, SC 29210, )
)
    and )
)
CHOICE HEALTH MANAGEMENT )
SERVICES, LLC )
2929 N. Oxford St. )
Claremont, NC 28610, )
)

and                                        )
                                           )
COMMUNITY SUNDRIES, LLC                     )
3917 Westpoint Blvd.                        )
Winston-Salem, NC 27103,                    )
                                           )
    and                                    )
                                           )
UNIVERSAL HEALTH                            )
CARE/BLUMENTHAL, INC.                       )
3724 Wireless Drive                         )
Greensboro, NC 28455,                       )
                                           )
    and                                    )
                                           )
UNIVERSAL HEALTH                            )
CARE/BRUNSWICK, INC.                        )
1070 Old Ocean Highway                      )
Bolivia, NC 28422,                          )
                                           )
    and                                    )
                                           )
CATAWBA VALLEY LIVING, LLC                  )
4174 Shook Road                             )
Claremont, NC 28613,                        )
                                           )
    and                                    )
                                           )
UNIVERSAL HEALTH CARE/                      )
CONCORD, INC.                               )
430 Brookwood Avenue NE                     )
Concord, NC 28025,                          )
                                           )
    and                                    )
                                           )
UNIVERSAL HEALTH CARE/                      )
FLETCHER, INC.                              )
86 Old Airport Road                         )
Fletcher, NC 28732,                         )
                                           )
    and                                    )
                                           )
UNIVERSAL HEALTH CARE/                      )
FUQUAY-VARINA, INC.                         )
410 S. Judd Parkway SE                      )
Fuquay-Varina, NC 27526,                    )
                                           )

and )
)
UNIVERSAL HEALTH CARE/ )
GREENVILLE, INC. )
2578 West Fifth Street )
Greenville, NC 27834, )
)
and )
)
UNIVERSAL HEALTH CARE/KING, INC. )
115 White Road )
King, NC 27021, )
)
and )
)
UNIVERSAL HEALTH CARE/LENOIR, INC. )
322 Nuway Circle )
Lenoir, NC 28645, )
)
and )
)
UNIVERSAL HEALTH CARE/ )
LILLINGTON, INC. )
1995 E. Cornelius Harnett Blvd. )
Lillington, NC 27546, )
)
and )
)
UNIVERSAL HEALTH CARE/ )
RALEIGH, INC. )
8200 Litchford Road )
Raleigh, NC 27615, )
)
and )
)
UNIVERSAL HEALTH CARE/ )
NORTH RALEIGH, INC. )
5201 Clarks Ford Drive NW )
Raleigh, NC 27616, )
)
and )
)
UNIVERSAL HEALTH CARE/ )
OXFORD, INC. )
500 Prospect Avenue )
Oxford, NC 27565, )
)
)

and                                        )
                                           )
UNIVERSAL HEALTH CARE/                     )
RAMSEUR, INC.                              )
7166 Jordon Road                           )
Ramseur, NC 27316,                         )
                                           )
        and                                )
                                           )
SATURN HEALTH, INC.                        )
1930 West Sugar Creek Road                 )
Charlotte, NC 28262,                       )
                                           )
        and                                )
                                           )
BRIAN CENTER/ST. ANDREWS, LLC              )
3514 Sidney Road                           )
Columbia, SC 29210,                        )
                                           )

        and

UNIVERSAL HEALTH CARE, INC.
3763 Golf Drive NE
Conover, NC 28613,

        Defendants.

## <u>COMPLAINT AND NOTICE OF LIS PENDENS</u>

Plaintiffs, UH Carolina Realty Holdings LLC ("**APA Plaintiff**"), UH Carolina SNF

Operations Holdings LLC ("**OTA Plaintiff**"), and UH Carolina Vacant Land Holdings LLC

("**REPA Plaintiff**") (collectively, "**Plaintiffs**"), hereby file this Complaint against Defendants,

Appalachian/ Brian Estates, Inc., Universal Properties/Greensboro, LLC, Universal

Properties/Brunswick, LLC, Universal Properties/Conover, LLC, Universal Properties/Concord,

LLC, Universal Properties/Greenville, LLC, Universal Properties/King, LLC, Universal

Properties/Lenoir, LLC, Universal Properties/Lillington, LLC, Universal Properties/Raleigh,

LLC, Universal Properties/North Raleigh, LLC, Universal Properties/Oxford, LLC, Universal

Properties/Ramseur, LLC, Universal Properties/Charlotte, LLC, Universal Properties/Columbia,

LLC, Choice Health Management Services, LLC, and Community Sundries, LLC (collectively,

"**APA Defendants**"); Appalachian/ Brian Estates, Inc., Universal Health Care/Blumenthal, Inc., Universal Health Care/Brunswick, Inc., Catawba Valley Living, LLC, Universal Health Care/Concord, Inc., Universal Health Care/Fletcher, Inc., Universal Health Care/Fuquay-Varina, Inc., Universal Health Care/Greenville, Inc., Universal Health Care/King, Inc., Universal Health Care/Lenoir, Inc., Universal Health Care/Lillington, Inc., Universal Health Care/Raleigh, Inc., Universal Health Care/North Raleigh, Inc., Universal Health Care/Oxford, Inc., Universal Health Care/Ramseur, Inc., Saturn Health, Inc., and Brian Center/St. Andrews, LLC (collectively, "**OTA Defendants**"); and Universal Health Care, Inc. ("**REPA Defendant**") (collectively, "**Defendants**"), provide notice of Lis Pendens, and for their causes of action state, as follows:

## INTRODUCTION

1.     This case is necessitated by Defendants' refusal to fulfill their contractual obligations to Plaintiffs for the stated reason that Defendants were "upset" that affiliates of Plaintiffs exercised contractual rights to terminate two of five separate, but related, agreements. Plaintiffs and their affiliates duly exercised contractual rights, and Defendants, in turn, repudiated their express contractual obligations and refused to perform the binding contracts relevant to this litigation.

2.     Beginning in or around early 2023, the parties negotiated the purchase and sale of certain assets relating to seventeen (17) skilled nursing and assisted living facilities in North Carolina and South Carolina, including separate agreements for the purchase and sale of a durable medical equipment (DME) company, a pharmacy, and a vacant parcel of real property, with the price of the facilities alone being Two Hundred Fifty-Seven Million Five Hundred Thousand Dollars ($257,500,000), and the aggregate of the contracts totaling Two Hundred Ninety-One Million Dollars ($298,500,000).

3. On or about July 31, 2023, the parties memorialized their agreements in five (5) separate, but related, contracts, true and correct copies of which are attached hereto as Exhibits A through F, and incorporated herein by reference, as follows: (a) Asset Purchase Agreement, as amended, for the purchase price of Two Hundred Fifty-Seven Million Five Hundred Thousand Dollars ($257,500,000), with seller financing of Five Million Dollars ($5,000,000) ("**Seller Financing**") (the "**Asset Agreement**"), (b) Operations Transfer Agreement, as amended (the "**Operations Transfer Agreement**" or "**OTA**"), (c) Real Estate Purchase Agreement, as amended, for the purchase price of Six Million Dollars ($6,000,000) (the "**Real Estate Agreement**" or "**REPA**"), (d) DME Asset Purchase Agreement, as amended, for the purchase price of Fifteen Million Dollars ($15,000,000) (the "**DME Agreement**" or "**DME APA**"), and (e) Pharmacy Asset Purchase Agreement, as amended, for the purchase price of Twenty Million Dollars ($20,0000,000) (the "**Pharmacy Agreement**" or "**Pharmacy APA**").

4. Each of these Agreements was duly executed, with each contract identifying (a) the specific parties to each contract, (b) the specific rights of said parties, and, most relevant to the issues at hand, (c) the interrelationship between the Agreements.

5. Plaintiffs and their affiliates negotiated the express unilateral right to terminate the DME Agreement and the Pharmacy Agreement, in their "sole and absolute discretion," during an agreed upon due diligence period. In other words, the DME Agreement and Pharmacy Agreement tangentially relate to – but by their express terms are severable from – the Asset Agreement, Operations Transfer Agreement, and the Real Estate Agreement.

6. On or about October 30, 2023, purchasers under both the DME Agreement and the Pharmacy Agreement timely exercised their negotiated contractual right to terminate these Agreements in their "sole and absolute discretion."

7.     Under the express terms of Section 6.04 of the Asset Agreement, the termination of the "Affiliated Agreements" triggered the APA Plaintiff's and APA Defendants' obligation to "mutually agree after good faith negotiations" to alternative DME and pharmacy contracts.

8.     In response, Defendants, intentionally repudiated the Asset Agreement, the Operations Transfer Agreement, and the Real Estate Agreement by refusing to continue to work in good faith toward the closings mandated by these three Agreements, despite the fact that each Agreement remained in full force and effect following the termination of the DME and Pharmacy Agreements.

9.     As described herein, directly contrary to the express terms of the Asset Agreement, Defendants have taken the unreasonable (and, to date, unexplained) position that termination of the DME Agreement and the Pharmacy Agreement somehow excuses Defendants' performance under the Asset Agreement, the Operations Transfer Agreement, and/or the Real Estate Agreement.

10.     It is undeniable that Section 6.04 of the Asset Agreement specifically contemplates a termination of the DME Agreement and/or the Pharmacy Agreement, explicitly requiring the parties to work in good faith to negotiate alternative pharmacy and DME contracts in the event of a termination.

11.     It is beyond reasonable dispute that the terminations of the DME Agreement and the Pharmacy Agreement were properly and timely exercised in accordance with the terms of those Agreements, given the Agreements' broad unilateral rights to the purchasers to terminate during the due diligence period in their "sole and absolute discretion."

12.     In response, however, Defendants most certainly did not negotiate replacement contracts in good faith, as required by the Asset Agreement, but rather cut off all communications

9

with Plaintiffs because they were "upset" regarding the termination of the DME Agreement and the Pharmacy Agreement.

13.     In other words, despite expressly agreeing to a specific process in the event the DME Agreement and/or the Pharmacy Agreement are/is terminated, Defendants, in bad faith, refused to cooperate and ultimately attempted to "terminate" the Asset Agreement, the Operations Transfer Agreement, and the Real Estate Agreement, without justification.

14.     Accordingly, Plaintiffs are forced to bring this action seeking specific performance under the Asset Agreement, the Operations Transfer Agreement, and the Real Estate Agreement, or in the alternative, money damages directly, proximately, and foreseeably caused by Defendants' intentional and blatant repudiations and breaches of these Agreements.

## PARTIES

15.     Plaintiff UH Carolina Realty Holdings LLC is a limited liability company. Its members are Israel Birnbaum and Jacob Kohn, who are residents of and domiciled in New York, and Michael Netzer, who is a resident of and domiciled in New Jersey.

16.     Plaintiff UH Carolina SNF Operations Holdings LLC is a limited liability company. Its members are Israel Birnbaum and Jacob Kohn, who are residents of and domiciled in New York, and Michael Netzer, who is a resident of and domiciled in New Jersey.

17.     Plaintiff UH Carolina Vacant Land Holdings LLC is a limited liability company. Its members are Israel Birnbaum and Jacob Kohn, who are residents of and domiciled in New York, and Michael Netzer, who is a resident of and domiciled in New Jersey.

18.     Defendant Appalachian Brian Estates, Inc. is a corporation organized under the laws of North Carolina and it maintains its principal place of business in North Carolina.

19.     Defendant Universal Properties/Greensboro, LLC, is a limited liability company, whose sole member is Donald C. Beaver, who is a resident of and domiciled in North Carolina.

20. Defendant Universal Properties/Brunswick, LLC is a limited liability company whose sole member is Donald C. Beaver, who is a resident of and domiciled in North Carolina.

21. Defendant Universal Properties/Conover, LLC is a limited liability company whose sole member is Donald C. Beaver, who is a resident of and domiciled in North Carolina.

22. Defendant Universal Properties/Concord, LLC is a limited liability company whose sole member is Donald C. Beaver, who is a resident of and domiciled in North Carolina.

23. Defendant Universal Properties/Greenville, LLC is a limited liability company whose sole member is Donald C. Beaver, who is a resident of and domiciled in North Carolina.

24. Defendant Universal Properties/King, LLC is a limited liability company whose sole member is Donald C. Beaver, who is a resident of and domiciled in North Carolina.

25. Defendant Universal Properties/Lenoir, LLC is a limited liability company whose sole member is Don Beaver, a resident of and domiciled in North Carolina.

26. Defendant Universal Properties/Lillington, LLC is a limited liability company whose sole member is Donald C. Beaver, who is a resident of and domiciled in North Carolina.

27. Defendant Universal Properties/Raleigh, LLC is a limited liability company whose sole member is Donald C. Beaver, who is a resident of and domiciled in North Carolina.

28. Defendant Universal Properties/North Raleigh, LLC is a limited liability company whose sole member is Donald C. Beaver, who is a resident of and domiciled in North Carolina.

29. Defendant Universal Properties/Oxford, LLC is a limited liability company whose sole member is Donald C. Beaver, who is a resident of and domiciled in North Carolina.

30. Defendant Universal Properties/Ramseur, LLC is a limited liability company whose sole member is Donald C. Beaver, who is a resident of and domiciled in North Carolina.

31.    Defendant Universal Properties/Charlotte, LLC is a limited liability company whose sole member is Donald C. Beaver, who is a resident of and domiciled in North Carolina.

32.    Defendant Universal Properties/Columbia, LLC is a limited liability company whose sole member is Donald C. Beaver, who is a resident of and domiciled in North Carolina.

33.    Defendant Choice Health Management Services, LLC is a limited liability company whose sole member is Donald C. Beaver, who is a resident of and domiciled in North Carolina

34.    Defendant Community Sundries, LLC is a limited liability company whose sole member is Donald C. Beaver, who is a resident of and domiciled in North Carolina.

35.    Defendant Universal Health Care/Blumenthal, Inc. is a corporation organized under the laws of North Carolina and it maintains its principal place of business in North Carolina.

36.    Defendant Universal Health Care/Brunswick, Inc. is a corporation organized under the laws of North Carolina and it maintains its principal place of business in North Carolina.

37.    Defendant Catawba Valley Living, LLC, is a limited liability company, whose sole member is Donald C. Beaver, who is a resident of and domiciled in North Carolina.

38.    Defendant Universal Health Care/Concord, Inc. is a corporation organized under the laws of North Carolina and it maintains its principal place of business in North Carolina.

39.    Defendant Universal Health Care/Fletcher, Inc. is a corporation organized under the laws of North Carolina and it maintains its principal place of business in North Carolina.

40.    Defendant Universal Health Care/Fuquay-Varina, Inc. is a corporation organized under the laws of North Carolina and it maintains its principal place of business in North Carolina.

41.    Defendant Universal Health Care/Greenville, Inc. is a corporation organized under the laws of North Carolina and it maintains its principal place of business in North Carolina.

42. Defendant Universal Health Care/King, Inc. is a corporation organized under the laws of North Carolina and it maintains its principal place of business in North Carolina.

43. Defendant Universal Health Care/Lenoir, Inc. is a corporation organized under the laws of North Carolina and it maintains its principal place of business in North Carolina.

44. Defendant Universal Health Care/Lillington, Inc. is a corporation organized under the laws of North Carolina and it maintains its principal place of business in North Carolina.

45. Defendant Universal Health Care/Raleigh, Inc. is a corporation organized under the laws of North Carolina and it maintains its principal place of business in North Carolina.

46. Defendant Universal Health Care/North Raleigh, Inc. is a corporation organized under the laws of North Carolina and it maintains its principal place of business in North Carolina.

47. Defendant Universal Health Care/Oxford, Inc. is a corporation organized under the laws of North Carolina and it maintains its principal place of business in North Carolina.

48. Defendant Universal Health Care/Ramseur, Inc. is a corporation organized under the laws of North Carolina and it maintains its principal place of business in North Carolina.

49. Defendant Saturn Health, Inc. is a corporation organized under the laws of North Carolina and it maintains its principal place of business in North Carolina.

50. Defendant Brian Center/St. Andrews, LLC, is a limited liability company, whose sole member is Donald C. Beaver, who is a resident of and domiciled in North Carolina.

51. Defendant Universal Health Care, Inc., is a corporation organized under the laws of North Carolina and it maintains its principal place of business in North Carolina.

## JURISDICTION AND VENUE

52. This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1). There is complete diversity between the parties, which consists of entities whose citizenship are New Jersey and New York on Plaintiffs' side and North Carlina on Defendants'

side. The contracts at issue in this lawsuit have collective purchase prices exceeding $260,000,000; thus, the amount in dispute is far in excess of $75,000, exclusive of interest and costs.

53. Venue is proper pursuant to 28 U.S.C. § 1391(b) because, *inter alia*, a substantial part of the events or omissions giving rise to the claim occurred, and a substantial part of property that is the subject of the action is situated, in this jurisdiction.

54. This Court has personal jurisdiction over each Defendant who is a citizen of North Carolina, and over all Defendants, as they each consented to jurisdiction in this forum in Section 17 of the Asset Agreement (Exhibit A), Section 22 of the Operations Transfer Agreement (Exhibit B), and/or Section 10.15 of the REPA (Exhibit C).

## FACTS

### I. The Agreements.

55. In addition to (a) the purchase and sale of skilled nursing and assisted living facilities under the Asset Agreement (Exhibit A), and (b) the interdependent Operations Transfer Agreement (Exhibit B), the contemplated transaction also included three additional "Affiliated Agreements," (c) the Real Estate Agreement, covering the purchase and sale of raw land to be developed for the relocation of 119 skilled nursing beds (Exhibit C), (d) the DME Agreement, covering the purchase and sale of assets of a company "in the business of selling, distributing and supplying durable medical equipment" (Exhibit D), and (e) the Pharmacy Agreement, covering the contemplated sale and purchase of assets of a company "in the business of selling, distributing and supplying pharmaceuticals" (Exhibit E).

56. On or about October 27, 2023, the parties amended each of these Amendments, and provided for Seller Financing of Five Million Dollars ($5,000,000) for the Asset Agreement. The Amendments are attached hereto as Exhibit F(i)-F(vi).

**A. The Asset Agreement and Operations Transfer Agreement.**

57.     Under the Asset Agreement, APA Plaintiff agreed to purchase, and APA Defendants agreed to sell, seventeen (17) skilled nursing and assisted living facilities located in North Carolina and South Carolina (identified in Exhibit A to the Asset Agreement) (the "**Facilities**"), for a purchase price of Two Hundred Fifty-Seven Million Five Hundred Thousand Dollars ($257,500,000), including a Good Faith Deposit of Ten Million Dollars ($10,000,000), and Seller Financing of Five Million Dollars ($5,000,000). *See* Exhibit A at p. 3; Exhibit F(i), and F(vi).

58.     Pursuant to Section 1.02 of the Asset Agreement, APA Plaintiff deposited $10,000,000 which is being held in escrow by Madison Title Agency LLC (the "**Good Faith Escrow**").

59.     Under the Operations Transfer Agreement, OTA Plaintiff agreed to accept, and OTA Defendants agreed to transfer the full operation and control of the Facilities that are the subject of the Asset Agreement.

60.     Unsurprisingly, the Operations Transfer Agreement and Asset Agreement are inextricably intertwined, with each expressly and undeniably contingent upon the other. In other words, there is no dispute that the Operations Transfer Agreement cannot "close" without the Asset Agreement also "closing," and *vice versa*. *See* Exhibits A and B.

61.     Neither the Asset Agreement nor the Operations Transfer Agreement, however, are contingent upon the REPA, the DME Agreement, or the Pharmacy Agreement. To the contrary, Section 6.04 of the Asset Agreement mandates the interrelation between the agreements as follows:

> Section 6.04 *Affiliated Agreements*. The applicable parties thereto shall have entered into the DME APA, the Pharmacy APA, and the Operations

Transfer Agreement, each of which shall be in full force and effect and the consummation of the transactions contemplated by such agreements shall have occurred simultaneously with the Closing under this Agreement [the Master APA]. ***Notwithstanding the foregoing, in the event that either the DMA APA or the Pharmacy APA, or both, is/are terminated in accordance with their respective terms by the DME Buyer or the Pharmacy APA, or both, as applicable, the condition set forth in this*** <u>***Section 6.04***</u> ***shall be deemed to exclude either the DME APA or the Pharmacy APA, or both, as applicable, if, and only if, (a) the Seller Parties and the Buyer Parties shall have entered into one or more agreement(s) that provide(s) for the DME Seller or Pharmacy Seller, or both, as applicable, to continue providing durable medical supply or pharmacy services to the Facilities*** for a period of five (5) years following the Closing Date, consistent with past volume and practice and ***at the fair market value for such services***, on such other terms and conditions and in such form as required to comply with applicable law and as the ***Seller and Buyer Parties mutually agree after good faith negotiations*** (the "<u>Alternative Pharmacy/DME Service Contract(s)</u>") and (b) such Alternative Pharmacy/DME Service Contract(s) are in full force and effect as of the Closing of this Agreement.

Exhibit A (bold/italics emphasis added; underline in original.)

62.     Accordingly, the Asset Agreement, by its express and unambiguous terms does <u>not</u> depend upon the DME Agreement or the Pharmacy Agreement; instead, upon the termination of either, or both, the parties to the Asset Agreement are required to work in good faith to negotiate "Alternative Pharmacy/DME Service Contract(s)."

63.     In addition to the requirement in Section 6.04 of the Asset Agreement to negotiate Alternative Pharmacy/DME Service Contracts, Section 7.02(N) of the Asset Agreement also provides, "[a]t the Closing, the Sellers [APA Defendants] will deliver or cause to be delivered to the Buyer [APA Plaintiff] the following: …. If the DME APA or the Pharmacy APA, or both, have been terminated, the applicable Alternative Pharmacy/DME Service Contract(s) executed by the DME Seller or the Pharmacy Seller, or both, as applicable."

64.     In sum, the Asset Agreement not only makes clear that the Asset Agreement is not contingent upon the DME Agreement or Pharmacy Agreement, but indeed provides for a specific process in the event either or both are terminated.

**B. The DME Agreement and Pharmacy Agreement.**

65.     The DME Agreement is a contract between affiliates of Plaintiffs and Defendants for the contemplated sale and purchase of a business that sells, distributes, and supplies durable medical equipment. The purchase price under the DME Agreement is Fifteen Million Dollars ($15,000,000). *See* Exhibit D.

66.     Section 4.04 of the DME Agreement entitled "Investigations," provides for a "Due Diligence Period," during which the contract purchaser may, in its "sole and absolute discretion," terminate the DME Agreement by providing written notice to seller. Exhibit D at pp. 6-7.

67.     The Pharmacy Agreement is a contract between affiliates of Plaintiffs and Defendants for the contemplated purchase and sale of a pharmacy business, owned and operated by an affiliate of Defendants, located at 3917 Westpoint Boulevard, Winston-Salem, North Carolina 27103 (the "**Pharmacy**"). The purchase price for the Pharmacy was Twenty Million Dollars ($20,000,000). *See* Exhibit E.

68.     Similar to the DME Agreement, Section 4.04 of the Pharmacy Agreement entitled "Investigations," provides for a "Due Diligence Period," during which the contract purchaser may in its "sole and absolute discretion," terminate the Pharmacy Agreement by providing written notice to seller. Exhibit E, at pp. 6-7.

69.     Both the DME Agreement and the Pharmacy Agreement include an identical Section 6.04, making clear both Agreements are contingent upon the Asset Agreement (but not

*vice versa*): "The closing of the [Asset Agreement] shall occur concurrently herewith." Exhibits D and E, at Section 6.04.

### C. The Real Estate Agreement.

70.     The Real Estate Agreement is for the purchase and sale of a raw parcel of real estate located at 651 Gilcrest Farm Road, Wake Forest, North Carolina 27587, for the purchase price of Six Million Dollars ($6,000,000). Exhibit C.

71.     Similar to the other contracts, the Real Estate Agreement unambiguously sets forth its relationship with the other "Affiliated Agreements" as follows: "The applicable parties thereto shall have entered into the [Asset Agreement], and the Operations Transfer Agreement, each of which agreements shall be in full force and effect and the consummation of the transactions contemplated by such agreements shall have occurred simultaneously with the Closing under this Agreement." Exhibit C, at Section 6.04, p. 12.

72.     Accordingly, the Real Estate Agreement is expressly contingent upon the Asset Agreement and Operations Transfer Agreement, but <u>not</u> the DME Agreement or the Pharmacy Agreement.

## II.     The DME Agreement and Pharmacy Agreement Were Properly Terminated.

73.     On or about January 23, 2023, the Due Diligence Period under the DME Agreement and the Pharmacy Agreement commenced; thus, both Due Diligence Periods were scheduled to expire on October 30, 2023.  *See* Exhibits D and E, at Section 4.04, pp. 6-7.

74.     On October 30, 2023, counsel for the purchasers under the DME Agreement and the Pharmacy Agreement communicated with counsel for the sellers under those Agreement and requested an extension of the Due Diligence Periods.

75. Sellers under the DME Agreement and the Pharmacy Agreement did not agree to the requested extensions of the Due Diligence Periods.

76. As a result, later that same day, before the expiration of the Due Diligence Periods, the purchasers under the DME and Pharmacy Agreements sent written notice terminating both the DME Agreement and the Pharmacy Agreement. A true and correct copy is attached hereto as Exhibit G and incorporated herein by reference.

### III. Defendants Repudiate and Fail to Perform Under the Asset Agreement, Transfer Agreement, and Real Estate Agreement.

77. Following the termination of the DME Agreement and the Pharmacy Agreement, as required under the Asset Agreement, APA Plaintiff contacted APA Defendants to move toward closing on the remaining three contracts: (a) the Asset Agreement, (b) the Operations Transfer Agreement, and the (3) Real Estate Agreement.

78. For example, on or about November 2, 2023, shortly after the termination of the DME Agreement and the Pharmacy Agreement, pursuant to Section 6.04 of the Asset Agreement, Plaintiffs initiated negotiations with Defendants for the Alternative Pharmacy/DME Service Contracts to satisfy an express condition of closing. A true and correct copy of this email is attached hereto as Exhibit H and incorporated herein by reference.

79. However, Defendants made it clear that the Agreements were "all or nothing," and refused to negotiate with Defendants for the Alternative Pharmacy/DME Service Contracts, or otherwise cooperate with Plaintiffs towards Closing of the Asset Agreement, OTA Agreement or the Real Estate Agreement.

80. As an example, on November 29, 2023, Defendants made it abundantly clear that they would not perform as required by the Asset Agreement, unless Plaintiffs ceded to Defendants' additional demands, not included in the contracts, as follows:

As we discussed yesterday and previously, **the sellers are upset** with buyer's actions and have offered a proposed path forward. The sellers await buyer's response to that proposal. If buyer accepts their proposal, we will need to get it papered rapidly and thereafter respond to these new and additional requests.

A true and correct copy of this email exchange is attached hereto as Exhibit I and incorporated herein by reference (emphasis added).

81.     In other words, Defendants refused to negotiate the Alternative Pharmacy/DME Service Contracts, as expressly required by Section 6.04 of the Asset Agreement or take any other action towards closing the three remaining binding Agreements.

## IV.    Termination of the DME Agreement and the Pharmacy Agreements Does Not Terminate the Other Three Contracts.

82.     Section 8.02 of the Asset Agreement provides, in part, "[u]pon any termination of this Agreement pursuant to its terms, the Operation Transfer Agreement and each Affiliated Purchase Agreement [the DME Agreement, the Pharmacy Agreement, and the Real Estate Agreement] shall also automatically terminate and be of no further force or effect." Exhibit A at p. 17.

83.     The Operations Transfer Agreement, likewise, includes a provision that expressly provides for automatic termination in the event that the Asset Agreement is terminated, but not the other Agreements, as follows: "This Agreement shall automatically terminate upon the termination of the [Asset] Agreement for any reason with no further action required by the Parties hereto." Exhibit B at Section 23.a, p. 22.

84.     The REPA, the DME Agreement, and the Pharmacy Agreement do _not_ contain similar language resulting in the automatic termination of the other Agreements upon termination of the REPA, the DME Agreement, or the Pharmacy Agreement.

## V.    REPA Defendant Breaches the Real Estate Agreement.

85.     Section 4.14 of the Real Estate Agreement provides, in part, as follows:

4876-9985-8823.4

Each Party hereto shall use its commercially reasonable efforts to promptly obtain any consents, authorizations, orders and approvals or make any filings for the transactions contemplated in this Agreement that may be or become necessary for such Party's execution, delivery and performance of this Agreement under any applicable law, and each Party shall reasonably cooperate with the other Parties in connection with same. Without limiting the generality of the foregoing sentence, ***promptly following the execution of this Agreement, the Seller and the Buyer shall submit a request (the "*<u>CON Letter</u>*") to the Certificate of Need Section of the North Carolina Department of Health and Human Services (the "<u>CON Section</u>")***, seeking a determination from the CON Section that there is good cause to permit the transfer of the Approved CON Relocation to Buyer in connection with the Buyer's acquisition of the Real Property (the "<u>CON Approval</u>"). ***The Buyer shall prepare the initial draft of the CON Letter for the Seller's review and approval, and the Buyer shall not submit the CON Letter to the CON Section without Seller's prior written approval of the CON Letter, which approval shall not be unreasonably withheld, conditioned or delayed.*** Exhibit C (bold/italics emphases added; underline in original.)

86.     On or about October 2, 2023, in accordance with Section 4.14 of the Real Estate Agreement, counsel for REPA Plaintiff sent counsel for REPA Defendant a letter enclosing a draft of the required CON Letter, requesting REPA Defendant's approval.   The parties exchanged drafts of the CON Letter through November 2, 2013.

87.     On or about November 2, 2023, counsel for REPA Plaintiff sent counsel for REPA Defendant a finalized draft of the required CON Letter, requesting REPA Defendant's approval. A true and correct copy of the November 2, 2023 letter is attached hereto as Exhibit J, and incorporated herein by reference.

88.     REPA Defendant did not approve or otherwise respond to REPA Plaintiff's draft CON Letter.

## VI.     Defendants Purport to "Terminate" the Agreements.

89.     On or about December 5, 2023, having failed to perform – and in fact after expressly repudiating their contractual obligations – remarkably, Defendants sent a letter purporting to "terminate" the Asset Agreement, the Operations Transfer Agreement, and the Real

Estate Agreement (the "**Bad Faith Termination Notice**"). A true and correct copy of the Bad Faith Termination Notice is attached hereto as Exhibit K, and incorporated herein by reference.

90. The supposed basis for the Bad Faith Termination Notice was Plaintiffs' alleged failure to agree to a purchase price allocation, pursuant to Section 1.03 of the Asset Agreement.

91. Section 1.03 of the Asset Agreement mandates that a purchase price allocation "shall be agreed upon by the **Buyer and the Sellers** prior to the expiration of the Due Diligence Period." Exhibit A, at p. 4 (emphasis added). In other words, this is not Plaintiffs' obligation; <u>both sides</u> are required to work together to achieve a purchase price allocation.

92. Indeed, on October 30, 2023, Plaintiffs sent Defendants a proposed purchase price allocation. A true and correct copy of the proposed allocation is attached hereto as Exhibit L, and incorporated herein by reference.

93. However, following the valid termination of the DME Agreement and the Pharmacy Agreement, Defendants stonewalled any and all efforts by Plaintiffs to move toward closing on the Asset Agreement, the Operations Transfer Agreement, and Real Estate Agreement, including refusing to negotiate Alternative Pharmacy/DME Service Contracts, and failing to negotiate a purchase price allocation.

94. In the Bad Faith Termination Notice, Defendants have taken the absurd position that Plaintiffs somehow breached their obligations under the Asset Agreement because the purchase price allocation was not agreed upon after Defendants chose to stonewall Plaintiffs.

95. As a matter of fact and law, Section 1.03 of the Asset Agreement is not Plaintiffs' obligation, is not a condition precedent to closing, and the failure to agree on the purchase price allocation is due to Defendants refusing to negotiate in good faith with Plaintiffs.

96.     In sum, Defendants blatantly repudiated their contractual obligations and intentionally frustrated Plaintiffs' efforts to perform under the three remaining Agreements. For Defendants to now attempt to use the failure to reach an agreement (which Defendants expressly refused to even discuss) to justify their "termination," flies in the face of reasonableness and good faith.

97.     Accordingly, Defendants should be compelled to fulfill their contractual obligations under the Asset Agreement, the Operations Transfer Agreement, and the Real Estate Agreement or, alternatively, if specific performance is no longer available due to Defendants' conduct, be ordered to compensate Plaintiffs for the many millions of dollars in damages caused by Defendants' flagrant breaches of the Agreements.

98.     Plaintiffs are hereby providing notice of a lis pendens on the real estate parcels that are the subject of the Asset Agreement and Real Estate Agreement.   A list of the 17 parcels to be conveyed pursuant to the Asset Agreement are attached hereto as Exhibit M and incorporated herein by reference.

**<u>COUNT I</u>**
**Breach of Contract – Specific Performance**
**(Asset Agreement and Operations Transfer Agreement)**
*APA and OTA Plaintiffs v. APA and OTA Defendants*

99.     Plaintiffs re-allege and incorporate the other allegations in this Complaint as if set forth fully in this Count.

100.     For good and valuable consideration, the parties entered into valid and binding Asset Agreement and Operations Transfer Agreement.

101.     Upon the termination of the DME Agreement and the Pharmacy Agreement, the parties to the Asset Agreement were required to negotiate, in good faith, Alternative

Pharmacy/DME Service Contracts, and APA Defendants were required to deliver or cause to be delivered to APA Plaintiff at the Closing the Alternative Pharmacy/DME Service Contracts.

102. APA Plaintiff attempted in good faith to negotiate the Alternative Pharmacy/DME Service Contracts with APA Defendants.

103. APA Defendants refused to negotiate the Alternative Pharmacy/DME Service Contracts, and therefore are unable to deliver that document at Closing.

104. Further, APA and OTA Defendants materially breached the Asset Agreement and Operations Transfer Agreement by wrongfully "terminating" the Agreements and refusing to proceed toward Closing, including refusing to negotiate the Alternative Pharmacy/DME Service Contracts, and issuing the Bad Faith Termination Notice.

105. Section 10.21 of the Asset Agreement, which governs both the Asset Agreement and the interrelated Operations Transfer Agreement, provides: "If the Seller Parties breach their obligations to consummate the Closing hereunder in accordance with the terms hereof, the Buyer shall be entitled to have such obligation to effectuate the Closing enforced by a proceeding in equity for specific performance." Exhibit A at p. 21.

106. APA and OTA Plaintiff performed all their obligations under the Asset Agreement and Operations Transfer Agreement and are entitled to demand full and adequate performance under the Agreements and the common law.

107. APA and OTA Plaintiffs are entitled to specific performance under the Asset Agreement and the Operations Transfer Agreement by APA and OTA Defendants, including the good faith negotiation and delivery at Closing of the Alternative Pharmacy/DME Service Contracts, and the ultimate Closing under the Asset Agreement and the Operations Transfer Agreement.

108.     APA and OTA Plaintiffs are also entitled to any costs and expenses incurred due to APA and OTA Defendants' breaches of the Asset Agreement and the Operations Transfer Agreement, such as additional third-party costs and expenses, necessary to Close on the Asset Agreement and the Operations Transfer Agreement.

WHEREFORE, APA and OTA Plaintiffs respectfully request that this Court enter judgment in their favor and against APA and OTA Defendants granting the following relief:

A.  Finding that APA and OTA Defendants repudiated and breached the Asset Agreement and Operations Transfer Agreement;

B.  Ordering APA and OTA Defendants to specifically perform under the Asset Agreement and Operations Transfer Agreement;

C.  An order awarding APA and OTA Plaintiff compensatory damages against APA and OTA Defendants for breaches of Asset Agreement and Operations Transfer Agreement, with the exact amount to be proven at trial;

D.  An award of such other, and further relief as this Court deems just and proper.

## COUNT II
### Breach of Contract – Damages
### (Asset Agreement and Operations Transfer Agreement)
### *APA and OTA Plaintiffs v. APA and OTA Defendants*

109.     Plaintiffs re-allege and incorporate the other allegations in this Complaint as if set forth fully in this Count.

110.     For good and valuable consideration, the parties entered into valid and binding Asset Agreement and Operations Transfer Agreement.

111.     Upon the termination of the DME Agreement and the Pharmacy Agreement, the parties to the Asset Agreement were required to negotiate, in good faith, Alternative

Pharmacy/DME Service Contracts, and APA Defendants were required to deliver or cause to be delivered to APA Plaintiff at the Closing the Alternative Pharmacy/DME Service Contracts.

112. APA Plaintiff attempted in good faith to negotiate the Alternative Pharmacy/DME Service Contracts with APA Defendants.

113. APA Defendants refused to negotiate the Alternative Pharmacy/DME Service Contracts, and therefore are unable to deliver that document at Closing.

114. Further, APA and OTA Defendants materially breached the Asset Agreement and Operations Transfer Agreement by wrongfully "terminating" the Agreements and refusing to proceed toward Closing, including refusing to negotiate the Alternative Pharmacy/DME Service Contracts, and issuing the Bad Faith Termination Notice.

115. APA and OTA Plaintiff performed all their obligations under the Asset Agreement and Operations Transfer Agreement.

116. In the event that APA and OTA Defendants frustrated APA and OTA Plaintiff's ability to close on the Asset Agreement and Operations Transfer Agreement, APA and OTA Plaintiff are entitled to all damages and losses incurred as a result of APA and OTA Defendants' material breaches of the Agreements.

117. As a direct, proximate, and foreseeable result of APA and OTA Defendants' breaches of the Asset Agreement and Operations Transfer Agreement, APA and OTA Plaintiff has suffered actual damages in the form of, *inter alia*, significant out-of-pocket fees and expenses, and many millions of dollars in lost profits.

WHEREFORE, APA and OTA Plaintiff respectfully request that this Court enter judgment in their favor and against APA and OTA Defendants granting the following relief:

A. Finding that APA and OTA Defendants repudiated and breached the Asset Agreement and Operations Transfer Agreement;

B. An order awarding APA and OTA Plaintiff compensatory damages against APA and OTA Defendants for breaches of the Asset Agreement and Operations Transfer Agreement in an amount in excess of Seventy-Five Million Dollars ($75,000,000), with the exact amount to be proven at trial;

C. An award of such other, and further relief as this Court deems just and proper.

**COUNT III**
**Breach of Contract – Specific Performance**
**(Real Estate Agreement)**
***REPA Plaintiff v. REPA Defendant***

118. Plaintiffs re-allege and incorporate the other allegations in this Complaint as if set forth fully in this Count.

119. For good and valuable consideration, the parties entered into a valid and binding Real Estate Agreement.

120. The Real Estate Agreement required the parties to this Agreement to cooperate with each other in obtaining and delivering certain specified documents, including the CON Letter.

121. Specifically, REPA Plaintiff was required to prepare a draft of that letter, and REPA Defendant was required to review and approve said letter, with such approval not to be unreasonably withheld, conditioned, or delayed.

122. Counsel for REPA Plaintiff timely prepared and transmitted a draft of the CON Letter to counsel for REPA Defendant.

123. REPA Defendant unreasonably withheld its approval of the CON Letter, which has precluded REPA Plaintiff from submitting it to the CON Section.

124. Further, REPA Defendant materially breached and repudiated the Real Estate Agreement by wrongfully "terminating" the contract and refusing to proceed toward Closing, including the issuance of the Bad Faith Termination Notice.

125. Section 10.21 of the Real Estate Agreement states, "If the Seller breaches its obligations to consummate the Closing hereunder in accordance with the terms hereof, the Buyer shall be entitled to have such obligation to effectuate the Closing enforced by a proceeding in equity for specific performance." Exhibit C at p. 18.

126. REPA Plaintiff performed all its obligations under the Real Estate Agreement and is entitled to demand full and adequate performance.

127. REPA Plaintiff is entitled to specific performance of the Real Estate Agreement, including REPA Defendant's approval of the CON Letter, and ultimately Closing on the transaction under the REPA.

128. REPA Plaintiff is also entitled to any costs and expenses incurred due to REPA Defendant's breaches of the Real Estate Agreement, such as additional third-party costs and expenses, necessary to Close on the Real Estate Agreement.

WHEREFORE, REPA Plaintiff respectfully requests that this Court enter judgment in its favor and against REPA Defendant granting the following relief:

D. Finding that REPA Defendant repudiated and breached the Real Estate Agreement;

E. Ordering REPA Defendant to specifically perform under the Real Estate Agreement;

F. An order awarding REPA Plaintiff compensatory damages against REPA Defendant for breaches of the Real Estate Agreement, with the exact amount to be proven at trial;

G. An award of such other, and further relief as this Court deems just and proper.

## COUNT IV
### Breach of Contract - Damages
### (REPA)
### *REPA Plaintiff v. REPA Defendant*

129.     Plaintiffs re-allege and incorporate the other allegations in this Complaint as if set forth fully in this Count.

130.     The Real Estate Agreement required the parties to that Agreement to cooperate with each other in obtaining and delivering certain specified documents, including the CON Letter.

131.     Specifically, REPA Plaintiff was required to prepare a draft of that letter, and REPA Defendant was required to review and approve said letter, with such approval not to be unreasonably withheld, conditioned, or delayed.

132.     Counsel for REPA Plaintiff prepared and transmitted the draft of the CON Letter to counsel for REPA Defendant.

133.     REPA Defendant unreasonably withheld its approval of the CON Letter, which has precluded REPA Plaintiff from submitting it to the CON Section.

134.     Further, REPA Defendant materially breached and repudiated the REPA by wrongfully "terminating" the Agreement and refusing to proceed toward Closing, including the issuance of the Bad Faith Termination Notice.

135.     REPA Plaintiff performed all its obligations under the Purchase Agreement and is entitled to demand full and adequate performance.

136.     In the event that the REPA Defendant frustrated REPA Plaintiff's ability to close on the Real Estate Agreement, REPA Plaintiff is entitled to all damages and losses incurred as a result of REPA Defendant's material breaches of the Agreement.

137.    As a direct, proximate, and foreseeable result of REPA Defendant's breaches, REPA Plaintiff suffered actual financial injury in the form of, *inter alia*, significant out-of-pocket fees and expenses, and significant lost profits, with the exact amount to be proven at trial.

WHEREFORE, REPA Plaintiff respectfully request that this Court enter judgment in its favor and against REPA Defendant granting the following relief:

H.  Finding that REPA Defendant repudiated and breached the Real Estate Agreement;

I.  An order awarding REPA Plaintiff compensatory damages against REPA Defendant for breaches of the Real Estate Agreement in an amount in excess of Five Million Dollars ($5,000,000), with the exact amount to be proven at trial;

J.  An award of such other, and further relief as this Court deems just and proper.

Respectfully submitted,

*/s/ Isaac Cordero*
Isaac Cordero | NC Bar No. 54680
David Hood | NC Bar No.
Patrick, Harper & Dixon
PO Box 218
Hickory, NC 28603
P: 828-322-7741
Local Counsel

/s/   E. Elliott Engel
Elchanan ("Elliott") Engel*
Brian M. Boyle*
Berman, Boyle & Engel, LLC
1777 Reisterstown Road, Suite 265
Baltimore, MD 21208
667-217-5150
ee@bbelaw.com
bmb@bbelaw.com
*Motions for admission pro hoc to be filed
*Attorneys for Plaintiffs, UH Carolina Realty Holdings LLC, UH Carolina SNF Operations Holdings LLC, and UH Carolina Vacant Land Holdings LLC*